IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 25, 2001

## STATE OF TENNESSEE v. TIMOTHY KEN SEXTON

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 222890     Douglas A. Meyer, Judge**

---

**No. E2000-01779-CCA-R3-CD**
**August 2, 2002**

---

The Hamilton County Grand Jury indicted the fifteen-year-old Defendant, charging him with second degree murder. Following a transfer hearing, the Defendant was tried as an adult. A Hamilton County jury found the Defendant guilty of the indicted charge, and the trial court sentenced him to twenty years in the Department of Correction. The Defendant now appeals, arguing the following: (1) that there was insufficient evidence to convict the Defendant of second degree murder, (2) that the juvenile court erred by transferring the Defendant to be tried as an adult, (3) that the trial court erred by denying the Defendant's motion to suppress his statement, (4) that the trial court erred by allowing the State to cross-examine two character witnesses for the defense about their knowledge of the Defendant's juvenile record, and (5) that the trial court erred in sentencing the Defendant to twenty years in the Department of Correction. Concluding that the trial court erred by allowing the State to introduce evidence of the Defendant's prior juvenile record during the cross-examination of character witnesses for the Defendant, we reverse and remand for a new trial.

**Tenn. R. Crim. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Donna Robinson Miller, Chattanooga, Tennessee (on appeal), and Michael Acuff, Chattanooga, Tennessee (at trial), for the Appellant, Timothy Ken Sexton.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; William H. Cox, III, District Attorney General; and Rodney C. Strong, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

A Hamilton County jury found the Defendant guilty of second degree murder for the shooting death of victim Larry Jones. The facts underlying the conviction were presented at trial as

follows: Officer Chad Sullivan of the Chattanooga Police Department testified that around 12:30 a.m. on May 16, 1998, he responded to a dispatch for a shooting at a carwash. When he arrived at the scene, Sullivan observed Kenneth Sexton, the Defendant's father, standing on the lot where the carwash was located, holding a can of beer in a bag. Sullivan asked Kenneth Sexton if he was injured or if he knew of anyone who was injured, and he replied in the negative. Sullivan testified that there was also a trailer on the lot. Sullivan walked towards the trailer and heard moaning from inside. Sullivan entered the trailer and found the victim slumped over the kitchen table. Sullivan testified that he noticed that the victim was bleeding from his side and appeared to be very faint. Sullivan stated that he asked the victim if he had been robbed or if someone had broken into the trailer, and the victim responded no to each question. Sullivan testified that when he asked the victim if he knew who shot him, the victim said, "no" and then began mumbling. Sullivan testified that the weapon used in the shooting was never recovered.

Sullivan recalled that he left the scene to go to the hospital, and when he returned, he noticed that a window was open on the trailer. Sullivan also noticed that the screen to the window was off. Sullivan testified that he went inside the trailer and found Kenneth Sexton asleep and apparently intoxicated. Officers began to search the area and noticed a nearby storage building. Patrick Phillips owned the building, as well as the carwash and the trailer. The officers waited for Patrick Phillips to arrive because there was a fence surrounding the building for which they did not have keys. Sullivan stated that Phillips arrived at the scene and climbed onto the roof of the storage building. Soon thereafter, he asked the officers to come up also. Sullivan testified that the officers found the Defendant on the roof, and it appeared that he had urinated on himself.

Detective Bill Phillips of the Chattanooga Police Department testified that he received a dispatch around 12:50 a.m., but because he was on another call, he was not able to get to the scene until around 3:20 a.m. Phillips recalled that the Defendant was found on the roof around 5:00 a.m. Phillips stated that the owner of the property unlocked the fence, put up the dogs and let the police onto the roof. Phillips testified that when they found the Defendant, he said, "Oh, thank God! Did y'all find the person that was shooting? Me and dad and Larry were down there and somebody just started shooting."

According to Phillips, the Defendant was transported to a juvenile detention facility, and a .45-caliber spent shell casing was found in the Defendant's pocket. Phillips took the Defendant's statement at 8:20 a.m. on the morning after the offense. In the statement, which was introduced into evidence, the Defendant admitted that he shot the victim but claimed that it was an accident. Phillips testified that the Defendant told him that the gun used to shoot the victim was at his father's house; however, police officers searched the house and did not find a gun. Phillips testified that the Defendant's weight as listed on an arrest report was one hundred and twenty pounds. The autopsy report revealed the victim's weight at death to be two hundred and seventy-six pounds.

The Defendant sent a letter to the trial court which was introduced into the record. In the letter, the Defendant begged the court for mercy and stated that he cried every night because the victim was dead. The Defendant stated, "[The victim] was my best friend." According to the

Defendant, he did not know what happened that night; he claimed that the victim "came out of his trailer talking about [how] he was going to kill [the Defendant]" and that "[the victim] scared [the Defendant] so bad that [he] feared for [his] life." The Defendant stated that "[he] didn't really mean to shoot [the victim]," but the "gun just went off." The Defendant also stated he blacked out after he shot the victim. The Defendant stated that he was guilty of being "young and dumb and being drunk at the time that it happened." The Defendant further testified that when he made his statement to police, Detective Phillips "took advantage" of the fact that the Defendant was young and intoxicated. According to the Defendant, when he made the statement, Detective Phillips told the Defendant that he was lying, made fun of him for being drunk, and said that the Defendant should not show any remorse during the interview.

Laura Hodge, a special forensic scientist for the Tennessee Bureau of Investigation (TBI), testified that she performed gunshot residue analyses on the Defendant and Kenneth Sexton. Hodge testified that both men testified positive, meaning that each of them "fired, handled or was near a gun when it was fired."

Donald Carmen, a special forensic firearms scientist with the TBI, testified that he examined a live cartridge round and two spent cartridge casings found at the scene. He stated that all three items would operate in a .45-caliber semi-automatic pistol. Carmen explained that a person must pull the trigger to shoot the gun and stated that "[f]or one pull of the trigger, you will get one shot until the magazine is empty." Carmen testified that the two spent casings had been fired from the same weapon. Carmen testified that the firing pin mark on the shell could be indicative of a problem with the firing of the weapon. Carmen testified that he also examined the victim's shirt to determine "muzzle to garment distance." Carmen determined that the residue on the shirt indicated a "very close range gunshot wound." According to Carmen, this means that the shot could have been "just off the surface, or it could be out to approximately one foot."

Dr. Frank King, the Hamilton County Medical Examiner, testified that the victim died approximately four days after being shot and stated that he performed an autopsy on the victim. King determined that the cause of death was a gunshot wound to the abdomen and that the gun used to kill the victim was fired from a distance of two feet or more from the victim. However, King did note that "sometimes the emergency medical treatment or subsequent hospital treatment of a wound does alter its appearance." King also testified that he did not see any of the clothing that the victim was wearing when he was shot. A copy of the victim's blood alcohol report at the time he was brought into the hospital was admitted into evidence. The report indicated that the victim had a blood alcohol level of .152 percent.

James Brazil testified that he lived with the Defendant and Kenneth Sexton and that he also knew the victim in this case. Brazil testified that around 10:00 p.m. on May 16, 1998, Kenneth Sexton went to a carwash and met the victim. The Defendant was with Brazil at the time. Brazil recalled that he and the Defendant had not eaten all day, so later that evening the Defendant called his father, Kenneth Sexton, who had just received a paycheck, to obtain money to buy food. According to Brazil, Kenneth Sexton was planning on spending all of his money on alcohol and

prostitutes, so the Defendant went to the carwash to get some of the money before Kenneth Sexton spent all of it.

Brazil testified that he and the victim did not get along with each other, so he waited across the street from the carwash for the Defendant to get the money. Brazil described the victim as "ornery and hateful" and stated that the victim "just didn't care too much about folks." He testified that the Defendant "doesn't really care that much about violence" and maintained that "if [the Defendant] could get away from it, he'd walk away from it." Brazil recalled waiting about thirty minutes for the Defendant and then "figured [that the Defendant's] dad was going to make [the Defendant] stay up there with him," so Brazil therefore returned to the Defendant's house, where he "hung out" with a man named Bruce. Brazil testified that approximately an hour after he last saw the Defendant, the Defendant returned home. Brazil described the Defendant as "scared" and "in a panic." According to Brazil, the Defendant said that he shot the victim. Brazil testified that he asked the Defendant if the victim was dead, and the Defendant responded that he did not know. When he asked the Defendant why he shot the victim, the Defendant said, "He should never have put his hands on me." Brazil testified that he was aware that the Defendant carried a gun and that he had it the night that the victim was shot. Brazil testified that after the Defendant returned home, Brazil walked to the market to get some food, and when he came back, the Defendant was gone.

Sheila Ann Real testified that she and her former fiancé, James Brazil, lived with the Defendant and Kenneth Sexton for almost a year. Real testified that the Defendant "didn't have a violent bone in his body." Real testified that the Defendant carried a .44-magnum pistol with him at all times "[j]ust to be big." Real also testified that she dated the victim for five or six years, and she stated that the victim would become violent when he drank. However, the victim's former fiancé, Roxanne Marie Shaw Woods, testified that she had known the victim between four and six years and had never known him to be violent.

Ted Millsaps, a guidance counselor at Loftis Middle School, testified that the Defendant was a foster child when he began Loftis Middle School on November 18, 1996. Millsaps stated that he took a special interest in the Defendant because of the Defendant's troubled background. Because the Defendant ranked above average on his standardized scores, he was placed in the seventh grade. Millsaps testified that he saw the Defendant everyday and stated that he had "never seen a student that was as happy, that tried as hard, wanted to please the teachers as [the Defendant] did." Millsaps did not recall the Defendant ever showing any signs of violence while at Loftis Middle School. The Defendant was removed from Loftis Middle School during spring break in 1997 and returned to his family.

Allan Jackson testified that he is a trauma nurse specialist for the Erlanger Medical Center trauma team. Jackson testified that he was involved in the preparation of physical and trauma history documents concerning the victim on the night of the shooting. According to the records, the victim's gunshot wound was self-inflicted. Jackson testified that this information came from "the emergency medical service, paramedics, first responders [or] firemen . . . ." He explained that "someone in that group would have stated that either on the radio or on the report."

# I. SUFFICIENCY OF THE EVIDENCE

The Defendant argues that insufficient evidence was presented at trial to convict him of second degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of second degree murder, which is defined, in pertinent part, as "[a] knowing killing of another." Tenn Code Ann. § 39-13-210(a)(1). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result . . . .'" Id. § 39-11-106(a)(20).

Viewing the facts in the light most favorable to the State, sufficient evidence was presented from which a properly instructed jury could convict the Defendant of second degree murder. The Defendant does not argue that he did not shoot the victim; he instead argues that the act was either the result of provocation or an act of self-defense. Hamilton County Medical Examiner Frank King testified that there was no indication that the shot that killed the victim was fired any closer than from a distance of two feet. In addition, the Defendant gave conflicting stories of the incident. In his statement, the Defendant told police that he shot the victim because the victim was choking him. However, in a letter to the trial court, which was admitted into evidence, the Defendant stated that the victim was trying to grab the gun from the Defendant's pocket, but the Defendant was able to

grab the gun first and point it at the victim's thigh, after which the gun went off. Finally, James Brazil testified that he asked the Defendant why he shot the victim, and the Defendant replied, "He should never have put his hands on me." Had the jury been properly instructed, this evidence is sufficient to convict the Defendant of second degree murder.

Pursuant to Rule 27(d) of the Tennessee Rules of Appellate Procedure, the Defendant argues that the trial court improperly instructed the jury as to the definition of "knowing." We note that this issue was not raised in the Defendant's motion for new trial. Generally, a challenge to jury instructions that is not raised in a defendant's motion for new trial is waived. Tenn. R. App. P 3(e); see also State v. Kendricks, 947 S.W.2d 875, 885 (Tenn. Crim. App. 1996). Additionally, the Rule 27(d) letter dated May 3, 2002, does not indicate that the State was notified of the Defendant's submission of supplemental authority. However, we do note that in this case, the jury instructions pertaining to the definition of "knowing" were erroneous.

At the conclusion of the evidence, the trial court instructed the jury as follows: "A person acts knowingly or with knowledge if that person acts with an awareness either that, one, his or her conduct is of a particular nature; or two, a particular circumstance exists. The requirement of knowing is also established if it is shown the defendant acted intentionally." Thus, the jury instruction utilized in this case, stating that the "knowing" mental state could be established by showing that the Defendant was aware that his conduct was of a particular nature or that particular circumstances existed, was improper for the offense of second degree murder and placed a lesser burden on the state than required for this "result-of-conduct offense." State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 65, at *11-12. (Tenn. Crim. App., Jackson, Jan. 30, 2001). Upon retrial, we direct the trial court to this Court's recent opinion in State v. James Noble Page, No. M2001-01853-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 332, (Tenn. Crim. App., Nashville, Apr. 16, 2002) for guidance in properly instructing the jury as to the definition of "knowing" in the offense of second degree murder.

## II. TRANSFER HEARING

The Defendant, who was fifteen years old at the time of the offense, was indicted by the Hamilton County Grand Jury for second degree murder for the shooting death of Larry Jones. The juvenile court held a transfer hearing, after which the Defendant was transferred to criminal court to be tried as an adult. The Defendant now argues that the juvenile court erred in transferring him to criminal court.

### A. Facts from Transfer Hearing

The evidence presented at the transfer hearing pertaining to the shooting of the victim and the Defendant's involvement in the crime was similar to the evidence later presented at trial. However, because the issue at the transfer hearing was the propriety of transferring the Defendant to the Hamilton County Criminal Court to stand trial as an adult, additional evidence pertaining to that issue was also presented. The additional evidence is summarized as follows:

The State read into the record the Defendant's prior criminal history, which included convictions for two thefts over $500 and a burglary of an automobile conviction. The Defendant was declared delinquent on those charges. The Defendant's criminal record also included the following: On June 21, 1996, the Defendant returned to court on charges of criminal trespass and theft over $500. On August 2, 1996, a probation for violation of probation was filed. The Defendant was later found delinquent on those charges as well. The Defendant remained on probation, but was placed in the Department of Children's Services due to his dependency and neglect. On October 7, 1996, another petition was filed for violation of probation. The Defendant then failed to appear on the settlement date for this petition.

Ted Millsaps, a guidance counselor at Loftis Middle School, testified that prior to the offense, the Defendant was placed in his school by the Department of Human Services. Millsaps testified that during the Defendant's time at Loftis, he "did excellent" and that Millsaps and the teachers "were very, very pleased with [the Defendant]." However, Millsaps also stated that the Defendant left the school after seventy days.

Tonya Cunningham, an employee of Hamilton County, testified that approximately two years prior to the trial, she was assigned to perform a non-custodial assessment of the Defendant. According to Cunningham, the Defendant's home did not have running water or electricity. In addition, Cunningham testified that the Defendant's parents had a lot of personal conflicts, and the Defendant seemed to be "in the middle of the situation." Cunningham testified that the Defendant had been truant from school for almost two years, and the Defendant's mother claimed that the Defendant's father hindered him from attending school. Cunningham testified that she did not believe that the Defendant was capable of a violent act.

B. Analysis

The Defendant argues that the juvenile court erred in transferring him to criminal court to be tried as an adult. The juvenile court may transfer a child under age sixteen who is charged with second degree murder to the criminal court to be dealt with as an adult if the court finds that reasonable grounds exist to believe that:
> (A) [t]he child committed the delinquent act as alleged;
> (B) [t]he child is not committable to an institution for the mentally retarded or the mentally ill; and
> (C) [t]he interests of the community require that the child be put under legal restraint or discipline.

Tenn. Code Ann. § 37-1-134(a)(4)(A)-(C). In making this determination, the trial court shall consider the following:
> (1) The extent and nature of the child's prior delinquency records;
> (2) The nature of past treatment efforts and the nature of the child's response thereto;
> (3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
> (4) Whether the offense was committed in an aggressive and premeditated manner;

(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and

(6) Whether the child's conduct would be a criminal gang offense, as defined in § 40-35-121, if committed by an adult.

Id. § 37-1-134(b)(1)-(6). Consideration of these factors is mandatory. Roger Lee Sawyers v. State, No. 03C01-9607-CC-00255, 1997 Tenn. Crim. App. LEXIS 704, at *6 n.5 (Tenn. Crim. App., Knoxville, July 25, 1997); see also State v. Shawnda James, No. 01C01-9803-CC-00093, 1999 Tenn. Crim. App. LEXIS 865, at *7 (Tenn. Crim. App., Nashville, Aug. 11, 1999); State v. Steven Lamar Ayers, No. 87-302-III, 1989 Tenn. Crim. App. LEXIS 173, at *7-8 (Tenn. Crim. App., Nashville, Mar. 10, 1989).

On appeal, our Court must determine whether there were reasonable grounds for the juvenile court to believe that the three criteria listed in Tennessee Code Annotated § 37-1-134(a)(4) were present in this case. State v. Cecil L. Groomes, No. M1998-00122-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 618, at *23 (Tenn. Crim. App., Nashville, Aug. 10, 2000). The juvenile court in this case first found that there was "reasonable cause to believe that this crime has been committed." Tenn. Code Ann. § 37-1-134(a)(4)(A). Kenneth Sexton testified that he saw his son, the Defendant, shoot the victim. Detective Phillips testified that several hours after the offense, he found the Defendant on a nearby roof. According to Phillips, the Defendant told him that he had scratches on his neck which he had received during a struggle. The State introduced into evidence the Defendant's statement in which he admitted that he shot the victim, but claimed that the gun went off "accidentally." We agree with the juvenile court that there were reasonable grounds to believe that the Defendant committed the offense.

The juvenile court did not make specific findings regarding the Defendant's mental health. However, there is a reasonable basis from the record to believe that the Defendant was not committable to an institution for either the mentally retarded or the mentally ill. See id. § 37-1-134(a)(4)(B). No evidence was presented to support such a commitment. The Defendant's guidance counselor testified that the Defendant "fit right in" and "did excellent" while he attended Loftis Middle School. In addition, the State presented a report indicating that the Defendant is not committable to an institution for either the mentally retarded or mentally ill.

Finally, the juvenile court determined that if the Defendant was found guilty of the charged offense, the interests of the community would be best served by some type of legal restraint. See id. § 37-1-134(a)(4)(C). In making its determination, the juvenile court noted that although the Defendant did not have a history of violent crimes, he was charged with "the most serious crime," which the court defined as the "taking of another human being['s] life." The juvenile court stated that it was clear that the Defendant had "had a lot of problems at home." The court stated, however, that the Defendant had been given opportunities "to do better on [his] own," but failed to "take advantage" of those opportunities. The juvenile court noted that "if [the Defendant is] found guilty of this offense then it will be necessary for the state to provide for [him] as a juvenile until such time as [he becomes] eighteen." Moreover, the court noted that the state "still [has] the ability to see that [he does] not go back into the streets and . . . pose this kind of threat to someone else . . . ." The

juvenile court stated that transferring the Defendant to criminal court was also in the Defendant's interest because "the juvenile system has nothing else for him." In our view, the juvenile court properly found that the interests of the community would be best served by some type of legal restraint.

Although the juvenile court found that Defendant should be transferred to criminal court to be tried as an adult because all three of the factors in Tennessee Code Annotated § 37-1-134(a)(4) applied, the Defendant argues that only two of the six considerations listed under Tennessee Code Annotated § 37-1-134(b) apply in his case, specifically, the nature of his prior delinquency record and the fact that the offense was committed against a person. "These factors relate to the interests of the community and whether the juvenile is amenable to treatment or rehabilitation through juvenile court rather than restraint or punishment meted out through the adult court . . . ." Groomes, 2000 Tenn. Crim. App. LEXIS 618, at *22. Although all six factors were not explicitly listed in the juvenile court's findings, we conclude that there was sufficient evidence in the record to support the court's ruling. Moreover, "[c]onstitutional due process does not require that evidence be discussed in judgments or that the criteria specified in [Tennessee Code Annotated] § 37-1-134(b) be discussed in judgments." Jim Hunter v. State, No. 944, 1986 Tenn. Crim. App. LEXIS 2649, at *3 (Tenn. Crim. App., Knoxville, Apr. 4, 1986).

The proof adduced at the transfer hearing was more than sufficient for the court to have "reasonable grounds to believe" that the Defendant had committed the murder, that he was not committable, and that the community's interests required him to be put under legal restraint or discipline. This issue is without merit.

## III. MOTION TO SUPPRESS

After his arrest, the Defendant made a statement to police in which he admitted that he shot the victim, but maintained that it was an accident. Prior to trial, the Defendant filed a motion to suppress his statement. A hearing was conducted on the motion, and the trial court denied the motion. The Defendant now argues that the trial court erred in allowing the State to introduce the Defendant's statement into evidence.

### A. Facts from Suppression Hearing

Patrick Scott Phillips testified at the hearing on the motion to suppress that he works for Williams Heating and Air Conditioning in Chattanooga. Phillips testified that his employer also owns a mini-storage business and a carwash. The victim was employed at the carwash and lived in a trailer located on the owner's property. According to Phillips, he was called to the scene by police around 1:00 a.m on May 16, 1998. Phillips stated that sometime between 3:00 a.m. and 5:00 a.m., he found the Defendant asleep on the roof of the storage building. After finding the Defendant, Phillips went downstairs and signaled to the police that someone was on the roof. According to Phillips, when officers brought the Defendant down from the roof, he appeared to be intoxicated "because he was smiling and happy, and . . . he had two officers with guns drawn directly on him,

and he was just happy." Phillips also testified that the Defendant was "not himself" and that he "was hollering at everybody." However, Phillips stated that he was never close enough to the Defendant to smell any alcohol.

Officer Chad Sullivan responded to the shooting and testified that he was involved in getting the Defendant down from the roof of the carwash, where he found the Defendant lying in a fetal position. According to Sullivan, the Defendant appeared "very scared, trying not to be seen." Sullivan could not tell whether the Defendant was asleep when he first approached; however, he soon noticed that the Defendant had urinated on himself and that the urine was running down the roof. Sullivan testified that the Defendant did not appear to be intoxicated.

Detective Bill Phillips testified that he interviewed the Defendant on the morning after the shooting. Phillips testified that neither of the Defendant's parents was present during the interview. According to Phillips, he separated the Defendant from Kenneth Sexton, the Defendant's father, because they were both suspects in the shooting. Phillips testified that at first, Kenneth Sexton denied having any knowledge about the shooting and then later changed his story, stating that it was the Defendant who shot the victim. Phillips maintained that he did not know where to find the Defendant's mother. Phillips testified that the Defendant told him that he did not have much contact with his mother because she lived far away. Phillips also stated that he was "pretty sure [that the Defendant] told [him] that she did not have a phone." Phillips testified that he advised the Defendant of his rights and stated that he had a certified copy of the waiver signed by the Defendant. Phillips recalled that he obtained some basic information from the Defendant, read him the waiver form verbatim, and asked the Defendant if he understood his rights. The Defendant replied that he understood and signed the form. Phillips testified that the Defendant did not appear to be intoxicated and that he did not believe that the Defendant was intoxicated when he was found on the roof. Phillips taped the Defendant's statement, and a copy of the tape was introduced into evidence.

Kenneth Nickerson, a psychologist at Moccasin Bend Mental Health Institute and Joseph Johnson Mental Health Center, evaluated the Defendant's competency to stand trial and his mental condition at the time of the offense. Nickerson determined that the Defendant was competent to stand trial and that there was no basis for a defense of insanity. In the mental status evaluation, Nickerson stated that the Defendant's "[i]ntellectual functioning was judged to be grossly within average range and not cognitively deficient." Nickerson testified that the Defendant had been at Moccasin Bend in August 1998, and at the time of admission, the Defendant was seen for an adjustment disorder and conduct disorder with alcohol and cannibis abuse. However, at the time of discharge, the Defendant was also diagnosed with a brief psychotic disorder with marked stressors. According to Nickerson, "marked stressors" means that stress can cause or intensify a psychotic episode in which the person is out of touch with reality. Nickerson testified that the Defendant told him that he had two beers on the night of the incident but that he could not remember the rest of the night until the police caught him.

The Defendant's mother, Nellie Sue Sexton, testified that the Defendant was born on January 1, 1983 and that in May 1998, the Defendant was fourteen years old. Ms. Sexton testified that the

Defendant missed quite a bit of school. Ms. Sexton also stated that she moved the Defendant to Georgia in May 1998 to keep him out of the custody of the State of Tennessee. Ms. Sexton testified that the Defendant had called her on the night of the offense, both before and after the shooting. According to Ms. Sexton, the Defendant told her that he thought he shot the victim in the hand.

Because Kenneth Sexton was charged as an accessory after the fact, he chose to invoke his Fifth Amendment right against self-incrimination and not testify at the hearing on the motion to suppress. However, his testimony from the transfer hearing was entered into evidence as an exhibit.

## B. Analysis

The Defendant argues that the trial court erred in denying his motion to suppress his statement to police. When an evidentiary hearing is held on the merits of a motion to suppress, the State must demonstrate by a preponderance of the evidence that the Defendant's statements were voluntary, knowing and intelligent. State v. Andrade Bruce Williams, Jr., No. 01C01-9803-CR-00104, 1999 Tenn. Crim. App. LEXIS 329, at *8 (Tenn. Crim. App., Nashville, Apr. 8, 1999) (citing State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980)). The trial court, as the trier of fact, is entrusted with determining the credibility of witnesses, as well as the weight and value of the evidence presented. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In determining the admissibility of a confession, the totality of the circumstances must be examined. State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996). The confession "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" Id. (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The standard to be followed is whether "'the behavior of the state's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined . . . .'" Kelly, 603 S.W.2d at 728 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)).

The same criteria used to determine the admissibility of an adult's statement are used to determine the admissibility of a juvenile's statement. State v. David Honey and Melissa Barnett, No. 03-C-01-9202-CR-00042, 1993 Tenn. Crim. App. LEXIS 83, at *18-19 (Tenn. Crim. App., Knoxville, Feb. 17, 1993). Accordingly, our supreme court has held

> that juvenile waivers shall be analyzed under a totality-of-the-circumstances test that requires consideration of the following factors:
>
> (1) consideration of all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;
>
> (2) the juvenile's capacity to understand the Miranda warnings and the consequences of the waiver;
>
> (3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

State v. Callahan, 979 S.W.2d 577, 583 (Tenn. 1998). Absent police coercive activity, no single factor should by itself render a juvenile's confession unconstitutional. Id. "Thus, the admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation." State v. Carroll, 36 S.W.3d 854, 864 (Tenn. Crim. App. 1999). "As a general rule, a statement made by a juvenile is admissible as evidence if the juvenile was given the Miranda warnings, these rights were understood by the juvenile, and the juvenile freely and voluntarily waived the rights before making the statement." David Honey and Melissa Barnett, 1993 Tenn. Crim. App. LEXIS 83, at *19.

A trial court's determination at a suppression hearing is presumptively correct on appeal. State v. Harbison, 704 S.W.2d 314, 318 (Tenn. 1986). The reviewing court is bound by the trial court's findings of fact unless the evidence found in the record preponderates against these findings. Odom, 928 S.W.2d at 23. On review, the prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom. Id. However, this Court is not bound by the trial court's conclusions of law. State v. Simpson, 968 S.W.2d 776, 779 (Tenn. 1998).

The Defendant argues that at the time of his statement, he had been up all night and had not eaten in two days. The Defendant also argues that there was "no showing of any familiarity on [the] Defendant's part with Miranda warnings" and that he was "developmentally delayed and intellectually immature." In addition, the Defendant argues that he had been drinking on the night of the offense. The Defendant maintains that police questioned him without his parents present and after he had been in custody for three hours.

The State argues that the Defendant was fully informed of his rights and gave a knowing, intelligent and voluntary statement to the police on the day of his arrest. Detective Phillips interviewed the Defendant on the morning after the offense. Phillips testified that he advised the Defendant of his rights, obtained some basic information from the Defendant, read the waiver form to the Defendant verbatim, and then asked the Defendant if he understood his rights. The Defendant replied that he understood and signed the waiver. Phillips stated that he did not believe that the Defendant was intoxicated or otherwise unable to understand what was happening.

Kenneth Nickerson testified that he performed a mental evaluation of the Defendant and found the Defendant competent to stand trial. He stated that he found no evidence to support a defense of insanity. Nickerson reported that there was "no apparent dysfunction that would render [the Defendant] incapable of understanding what he was being told." Although the Defendant argues that he had not slept or eaten at the time of the interrogation, there is no indication that he was not able to understand what was being asked of him. In denying the motion, the trial judge stated,

My impression of listening to the tape [of the Defendant's statement] was that [the Defendant's] mind was working very well. He was very careful in what he said. No indication of intoxication as far as I could see from listening to the transcript.

The trial court further noted that there was no showing of coercive police activity. The trial court found that it was a valid waiver and stated, "I'm not even so sure that the statement hurts him all that much. I mean, he testifies quite a bit, there to, to make it out to be self-defense."

Finally, the absence of the Defendant's parents from the interrogation does not render the waiver invalid. See Carroll, 36 S.W.3d at 864. Detective Phillips testified that the Defendant's father could not be in the room because he was also a suspect, and the Defendant's mother was unavailable. Thus, we conclude that there is not sufficient evidence to preponderate against the trial court's finding that the waiver was valid.

## IV. INTRODUCTION OF JUVENILE RECORD

Prior to trial, defense counsel filed a Motion in Limine to prevent the State from eliciting testimony regarding the Defendant's juvenile record. The trial court granted the Defendant's motion. The Defendant now argues that the trial court erred in allowing the State to introduce evidence of the Defendant's prior juvenile record to impeach a witness who testified about the Defendant's character.

At trial, defense counsel questioned Ted Millsaps, a counselor at Loftis Middle School, regarding the Defendant's reputation for violence and Millsaps' personal opinion as to whether or not the Defendant is a violent person. Millsaps testified that the Defendant's reputation was "good" and that there "was never a sign of violence whatsoever." Following this line of questioning, the State asked, "Obviously by introducing character, may I ask about his juvenile record?" The trial court responded that the State could question Millsaps about the Defendant's juvenile record. The State then asked the witness if he was aware that the Defendant had been convicted of burglary of an automobile, criminal trespass, violation of probation, and three counts of theft. The Defendant did not object to the introduction of his juvenile record.

The Defendant now argues that the trial court erred in allowing the State to question Ted Millsaps about the Defendant's prior juvenile record. Tennessee Code Annotated § 37-1-133 provides that

[t]he disposition of a child and evidence adduced in a hearing in juvenile court may not be used against such child in any proceeding in any court other than juvenile court, whether before or after reaching majority, except in dispositional proceedings after conviction of a felony for the purposes of a pre-sentence investigation and report.

Tenn. Code Ann. § 37-1-133(b). Thus, the juvenile record of a criminal defendant is not generally admissible in the guilt phase of the trial. State v. Davis, 741 S.W.2d 120, 123 (Tenn. Crim. App. 1987).

However, this Court has upheld a trial court's ruling that the credibility of a character witness for the Defendant can be properly impeached by cross-examining the witness about his knowledge that the Defendant had been charged with various offenses in juvenile court. Stepheny v. State, 570 S.W.2d 356, 359 (Tenn. Crim. App. 1978). In Stepheny, a character witness for the defendant was cross-examined about his knowledge that the defendant had been charged with various offenses in juvenile court. Id. However, the court in Stepheny noted that the questions did not relate to "the disposition of the juvenile or of evidence adduced against him," id., and that the trial court instructed the jury contemporaneously with the testimony and at the conclusion of the case that it could only consider the evidence as it affected the credibility of the witness. Id. The Stepheny court pointed out that "it would not be in harmony with the primary function of a trial as a truth finding expedition to allow the appellant to present to a jury through character witnesses an unchallenged cloak of respectability and standing in the community when in fact that was not true." Id. Our Court later relied on Stepheny to conclude that "the state may inquire as to the witness' knowledge of any juvenile arrests of the defendant so long as the arrest is relevant to the character trait." State v. Carlito D. Adams, No. CCA-02C01-9608-CR-00267, 1997 Tenn. Crim. App. LEXIS 1247, at *38-39 (Tenn. Crim App., Jackson, Dec. 11, 1997).

In this case, the jury heard evidence that related to the disposition[1] of the juvenile Defendant, but did not hear any evidence adduced against him. The trial court charged the jury following Ted Millsaps' testimony as follows:

> [J]urors, let me advise you that the questions put to the last witness concerning his knowledge of the prior bad acts are not substantive evidence of the defendant's good or bad character. That's merely meant to question the witness's ability to know what his reputation was, but you cannot accept it for the truthfulness of it.

No additional instruction pertaining to this testimony was given to the jury as part of the concluding instructions.

Rule 404(a)(1) of the Tennessee Rules of Evidence allows the introduction of "[e]vidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same." Rule 405 of the Tennessee Rules of Evidence deals with methods of proving character and allows proof to be presented by "testimony as to reputation or by testimony in the form of an opinion." Tenn. R. Evid. 405(a). Rule 405 contemplates that a character witness can be cross-examined about "relevant specific instances of conduct" on the part of the person whose character is in issue. Id. Rule 405 contemplates a jury-out hearing, if requested, after which the court must determine that a reasonable factual basis exists for the inquiry and that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues. See Tenn. R. Evid. 405(a)(1)-(3).

In the present case, the "application to the court," Tenn. R. Evid. 405(a), contemplated by Rule 405 consisted of the prosecuting attorney simply stating to the court: "Obviously by introducing

---

[1]"Disposition" in this context, as in Stepheny, id., refers to the nature of the charges in juvenile court.

character, may I ask about his juvenile record?" The trial court responded affirmatively, and no request was made by defense counsel for a jury-out hearing. Thus, no determination was made by the trial court that a reasonable factual basis for the inquiry existed, and perhaps more importantly, that the probative value of the conduct on the character witness's credibility outweighed its prejudicial effect on substantive issues.

We find that a portion of the Advisory Commission Comments to Rule 405 is particularly pertinent to the situation in this case:

> The indirect effect of such a cross-examination may be the more damaging to the accused. While the jury will be instructed to consider the rumors only as affecting the character witness's credibility, the practical danger is that such rumors - even if untrue - place the defendant's character in a bad light with the jurors. In an effort to alleviate the problem, the proposed rule sets out detailed procedural safeguards. The cross-examiner must apply to the court for permission to inquire into specific instances of conduct, the jury must be excused, and the court must determine both that a factual basis exists and that probative value for impeachment outweighs prejudicial effect on the accused's character.

Tenn. R. Evid. 405 advisory comm'n cmts.

In the present case, the Defendant was attempting to show through character witnesses that he is not a violent person. Therefore, the "[e]vidence of a pertinent character trait" contemplated by Rule 404(a)(1) in this case is the trait of being non-violent. It is important to note that in cross-examining a character witness about specific acts of the accused, the specific act must be relevant to the character trait about which the witness has testified. State v. Nesbit, 978 S.W.2d 872, 881 (Tenn. 1998). In the present case, the character witness was cross-examined about his awareness of the Defendant's juvenile arrests for theft, burglary of an automobile, criminal trespass, and a violation of probation, none of which pertain to the character trait of violence.

In the present case, a second character witness, Sheila Real, was also cross-examined about the Defendant's juvenile convictions for thefts and burglaries. Again, Ms. Real had testified on direct that the Defendant was not a violent person. The trial court gave no contemporaneous jury instruction pertaining to the cross-examination of Ms. Real. Further, no such instruction was given by the court as part of the jury instructions at the conclusion of the evidence.

While we agree that a character witness is "fair game" for a rigorous cross-examination, we do not believe that the juvenile court convictions utilized by the State to cross-examine the Defendant's character witnesses were relevant to the character trait about which those witnesses testified. We have concluded that the present case is distinguishable from Stepheny. First, in Stepheny, the questions utilized by the State during cross-examination did not relate to "the disposition of the juvenile or of evidence adduced against [the defendant]." Stepheny, 570 S.W.2d at 359. In this case, the questions did relate to the disposition of the juvenile. In Stepheny, the trial court charged the jury to only consider this evidence as affecting the credibility of the witness. Id. This charge was given to the jury contemporaneously with the testimony and at the conclusion of

all the evidence. In the present case, one contemporaneous instruction was given following the testimony of Millsaps, none was given following the testimony of Real, and none was given as part of the concluding instructions after the evidence was presented.

In this case, the record indicates that the Defendant failed to object to the State's request to cross-examine the Defendant's character witnesses about the Defendant's juvenile record, and defense counsel made no request for a jury-out hearing on this issue. Generally, if a party fails to make a contemporaneous objection to testimony presented at trial, the issue will be waived on appeal. Tenn. R. App. P. 36(a); see also State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, Tennessee Rule of Appellate Procedure 36(b), Tennessee Rule of Evidence 103(d), and Tennessee Rule of Criminal Procedure 52(b) allow this Court to take notice of "plain errors" that were not raised in the proceedings below. State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). The issue of "'whether or not an appellate court should recognize the error and grant relief in the absence of an objection in the trial court must depend on the facts and circumstances of the particular case.'" Id. (quoting State v. Ogle, 666 S.W.2d 58, 61 (Tenn. 1984)). This Court has set forth five factors to be considered when deciding whether an error constitutes "plain error" in the absence of an objection at trial:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). The Adkisson test has been formally adopted by our supreme court as the test to be utilized when reviewing a record for plain error. See Smith, 24 S.W.3d at 283. In our view, each of the five factors cited above is present is this case. The record clearly establishes what occurred in the trial court, a clear and unequivocal rule of law was breached, a substantial right of the accused was adversely affected, there is no indication that the accused waived the issue for tactical reasons, and consideration of the error is necessary to do substantial justice in this case. The degree of homicide, if any, and the Defendant's mental state at the time he shot the victim were critical, contested issues in this case. Accordingly, we must reverse the Defendant's conviction and remand for a new trial.

## V. SENTENCING

After the Defendant was convicted of second degree murder, a Class A felony, the trial court held a sentencing hearing. At the hearing, the records regarding the Defendant from the Department of Children's Services were introduced. The sentencing report prepared by Anne-Marie Malone, as well as the presentence report, were entered into evidence. These reports revealed that the Defendant came from a very dysfunctional family. Dr. Kenneth Nickerson testified that he performed a forensic evaluation on the Defendant at Joseph Johnson Mental Health Center in October 1998. Nickerson found the Defendant competent to stand trial and did not find any evidence that would support an insanity defense. Nickerson testified that the Defendant had a troubled childhood and that the

Defendant was exposed to alcohol and cannabis at a very young age, which led to his subsequent criminal behavior.

Mary Palmer testified that she was a foster parent to the Defendant from October 1996 to April 1997. Palmer testified that although a bit quiet and shy, the Defendant was "just a wonderful little boy." Palmer testified that the Defendant would go home to visit his parents on the weekends and come back wearing the same clothes he was wearing when he left.

Ted Millsaps, a guidance counselor at Loftis Middle School, testified that when the Defendant first came to his school, he was shy and afraid. After taking a standardized test, the Defendant was placed in the seventh grade. Millsaps testified that the Defendant was behind at first, but with help from the teachers, the Defendant improved. Millsaps testified that he had "never seen a young person try harder than [the Defendant] did."

Kenneth Sexton, the Defendant's father, testified that about a month prior to the shooting, he and the Defendant were walking down the street, and several men followed them. Sexton reported that one of the men cut Sexton's throat, knocked him down, and took all his money.

James Davis, the Defendant's half-brother, recalled that he moved in with the Defendant and the Defendant's parents when the Defendant was three or four years old and lived with them for about three years. Davis testified that he continued to visit the Defendant after he moved out. Davis testified that sometimes the lights and water would be off at the Defendant's house for two or three months at a time. Davis stated that when the Defendant was nine years old, he would refuse to go to school, despite his family's efforts to get him to go.

Louise Nelson, a GED teacher at the Hamilton County jail, testified that she taught the Defendant twice a week for two hours. Nelson testified that the Defendant had done extremely well in his studies and that he is eager to learn. Nelson testified that the Defendant is very respectful and cooperative.

Shields Cortner, the victim's half-brother, testified that the victim was not a violent man, but rather that he was a "very, very big-hearted man." Cortner testified that the victim "took in Kenny Sexton more than once because he wasn't working," and he "tried to help out [the Defendant]." Cortner testified that the victim's death was "devastating" because the victim was his "last immediate family." Cortner maintained that the Defendant "should be strapped down and executed." Cortner stated that the victim had expressed concerns that the Defendant was not in an appropriate environment.

The Defendant argues that the trial court erred in its application of mitigating factors and in sentencing the Defendant to twenty years in the Department of Correction. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is

conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The Defendant was convicted of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(b). Because the Defendant was sentenced as a Range I standard offender, the appropriate range for his sentence was fifteen to twenty-five years. See id. § 40-35-112(a)(1). The presumptive sentence for a Class A felony is the midpoint of the sentencing range unless there are enhancement or mitigating factors present. Id. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In sentencing the Defendant, the trial court applied the following enhancement factors: (1) that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1); (2) that "[t]he defendant possessed or employed a firearm . . . during the commission of the offense," id. § 40-35-114(9); and (3) that "[t]he defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult . . . ." Id. § 40-35-114(20). The record supports the trial court's application of these enhancement factors.

The trial court applied the following mitigating factors: (1) that "[t]he defendant acted under strong provocation," id. § 40-35-113(2); (2) that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense," id. § 40-35-113(3); (3) that "[t]he defendant, because of youth . . . , lacked substantial judgment in committing the offense," id. § 40-35-113(6); (4) that "[t]he defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense," id. § 40-35-113(8); (5) that "[t]he defendant assisted the authorities in locating or recovering any property . . . involved in the crime," id. § 40-35-113(10); (6) that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," id. § 40-35-113(11); and (7) that the Defendant continued his education by getting his GED, that the Defendant had a troubled childhood, and that the Defendant has remorse. See id. § 40-35-113(13).

Regarding the mitigating factors, the trial court stated that it gave very little weight to the fact that the Defendant acted under provocation, see id. § 40-35-113(2), or that substantial grounds existed to excuse or justify the Defendant's conduct. See id. § 40-35-113(3). The trial court, however, did give weight to the Defendant's age and to its finding that he lacked substantial judgment in committing the offense. See id. § 40-35-113(6). The trial court gave little weight to the factor that the Defendant was suffering from a mental condition because the evidence presented only showed that the Defendant had depression with psychotic symptoms. See id. § 40-35-113(8). The trial court gave little weight to the fact that the Defendant helped police locate the gun, as the court noted that it probably would have been found anyway. See id. § 40-35-113(10). The trial court gave some weight to the factor that the Defendant, although guilty of the crime, committed the offense under unusual circumstances. See id. § 40-35-113(11). In sentencing the Defendant, the trial court also considered the fact that the Defendant had obtained his GED, and it considered the Defendant's apparent remorse for having committed the crime. See id. § 40-35-113(13). The trial court rejected all other mitigating factors proposed by the defense.

The trial court stated that the Defendant "obviously is from a dysfunctional family" and that Kenneth Sexton, Defendant's father, is a "sorry human being." The trial court also stated that the Defendant's mother is unfit and "a sorry specimen of human life." The trial court noted that the Defendant was a "victim for 15 years of his life by his family." However, the trial court stated that although the Defendant "never really had a chance . . . he is responsible for his acts." As such, the Defendant was sentenced to twenty years in the Department of Correction.

In this case, the trial court applied three enhancement factors and seven mitigating factors. After weighing the different factors, the trial court ultimately determined that the sentence should be twenty years, which is the midpoint of the sentencing range, and the presumptive sentence in the absence of enhancing or mitigating factors. Id. § 40-35-210(C). Although the court applied only three enhancement factors, it weighed those more heavily than the mitigating factors. The trial court noted that it put little weight on many of the mitigating factors. As previously stated, the weight to be given each factor is within the discretion of the trial judge. Shelton, 854 S.W.2d at 123. We conclude that the evidence in the record supports the trial court's findings and that twenty years is an appropriate sentence in this case.

VI. Conclusion

Because we have concluded that the trial court committed reversible error by improperly allowing evidence to be introduced at trial regarding the Defendant's juvenile record, we REVERSE the Defendant's conviction and REMAND for a new trial.

_____
ROBERT W. WEDEMEYER, JUDGE